**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

MARQUIS HEALTH CONSULTING
SERVICES, LLC,
                 *Plaintiff*,

v.

CHRISTOPHER SAVINO,
                 *Defendant*.

Civil Action No.:

## PLAINTIFF'S VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Marquis Health Consulting Services, LLC ("Marquis" "Plaintiff"), for its Verified Complaint for Injunctive Relief and Damages against Defendant Christopher Savino ("Savino"), hereby states and alleges the following:

### INTRODUCTION

1. Marquis brings this claim against Savino seeking injunctive relief and damages for Savino's breach of his obligations under the *Agreement Against Unfair Competition* ("Agreement") he signed in April 2023, attached hereto as Exhibit A. Savino has violated his contractual obligations to Marquis by accepting a position with Atlas Healthcare NJ, LLC ("Atlas") in violation of his non-competition obligations, as well as soliciting and/or helping Atlas solicit, recruit and/or hire multiple employees of Marquis and/or its affiliates since he accepted a position with Atlas in May 2025. Despite Marquis reminding Savino of his obligations under the Agreement in June 2025, Defendant has not provided Marquis with adequate assurances that he will not compete with Marquis in violation of his covenant not to compete. In fact, in a call with Atlas, Marquis confirmed that Atlas intended to hire Savino despite his non-competition covenant. Marquis seeks injunctive relief and damages for Savino's breach of the Agreement arising from Savino's proposed

1

employment with a direct competitor of Marquis within the same geographic region he worked for Marquis, and his role in the solicitation and/or departure of multiple Marquis employees.

2. Marquis also seeks damages for Savino's breach of his fiduciary duty of loyalty arising from Savino encouraging, recruiting, soliciting, and/or inducing Marquis' employees to leave Marquis and join Atlas, all while Marquis continued to employ and pay Savino. Savino acted in Atlas' best interests while working for Marquis and used his intricate knowledge of Marquis' confidential personnel information to help Atlas poach and attempt to poach certain employees.

**Parties, Jurisdiction and Venue**

3. Marquis is a New Jersey LLC with a principal place of business located in New Jersey at 1608 RT-88, Suite 301, Brick, NJ 08724. Marquis has two LLC members, Tryko Holdings LLC and Skilled Ventures LLC. All Trustees of both member LLCs are located in New Jersey.

4. Savino is a citizen of Rhode Island residing at 141 Oakland Avenue, Pawtucket, RI 02861.

5. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are fully diverse and the amount in controversy exceeds $75,000.

6. This Court also has jurisdiction over Savino because he executed the Agreement, which includes the following statements regarding jurisdiction and venue in the New Jersey Courts:

> "This Agreement shall be given effect and construed by application of the laws of the State of New Jersey (without regard to the principles thereof governing conflict of laws), and any action or proceeding arising hereunder shall only be brought in the courts of the State of New Jersey or in a United States District Court sitting in the State of New Jersey and

each of the parties consents to the exclusive jurisdiction of such courts (and of the appropriate appellate courts)." *See* Exh. A at ¶ 7.

7. Venue is proper in this Court because Savino has agreed that any disputes arising out of the Agreement shall be brought only in the state and federal courts of New Jersey.

## **FACTS**

### **Marquis' Business and Effort to Protect Confidential Commercial Information**

8. Marquis provides administrative and consulting services to skilled nursing facilities and Senior Housing communities throughout the United States' Eastern Seaboard. Marquis provides services to facilities in Massachusetts, Maryland, Rhode Island, New Jersey, Pennsylvania, Florida and Virginia.

9. Marquis provides operational guidance to enable nursing facilities to achieve their quality and operational goals. Specifically, Marquis equips providers with advanced information technology, progressive tools, and strategies that empower them to deliver reliable, efficient, and innovative care, which drives exceptional outcomes and increased patient/resident satisfaction.

10. Throughout its more than a decade in business, Marquis and the facilities that Marquis works with have developed strong relationships with the hospitals, doctors, and other referral sources who refer patients to the facilities that Marquis advises.

11. Marquis and the facilities it services exert significant efforts and costs to protect their legitimate business interests and protect their relationships with their referral sources, which have been developed through years of effort.

12. Marquis' industry is similar to the medical specialty industry, which moves at a slower pace than many other industries and requires longer to develop referral source and patient relationships.

13. In addition, Marquis has spent valuable resources identifying and developing its employee talent and that of the facilities it advises. For instance, Marquis spends a considerable amount of time and investment in training its management employees so that they can be successful employees within the Marquis business model. Marquis administers personal, intensive, and ongoing training to its employees and those of the facilities it advises, through an established program, wherein employees gain knowledge of Marquis' unique techniques of obtaining referral sources, employee relations, marketing and solicitation to potential patients and cultivating and maintaining relationships with existing patients and their families.

14. Marquis has generated a substantial amount of goodwill by building, cultivating, supporting, and maintaining relationships between employees of Marquis and/or the facilities it advises on the one hand, and referral sources on the other. The goodwill is enhanced and cultivated by Marquis' marketing, training, and support.

15. In addition to Marquis' substantial investment in its relationships with referral sources and the facilities it advises, and training of employees, Marquis has also developed vast amounts of confidential commercial information including, but not limited to: (1) information regarding business plans, trade secrets, existing or potential transactions with third parties, financial information, intellectual property, products, services, research and development, operations, marketing, sales, pricing, margins and trade know-how; (2) personnel information, such as the identity and number of employees of Marquis and the facilities it advises, their compensation packages, skills, qualifications, work completed for Marquis and such facilities, experience and abilities; (3) non-public information regarding Marquis' referral sources and the facilities Marquis advises including contacts, agreements between Marquis and those entities and/or individuals, and required services; and (4) confidential patient information including their

non-public contact information, required services, and agreements between the facilities Marquis advises and their patients and patients' families.

16. In order to protect these valuable assets, and for good and valuable consideration, Marquis requires each of its employees to sign restrictive covenant agreements that typically include confidentiality, non-competition and non-solicitation provisions, generally upon the commencement of such employee's employment or at the time of certain job changes or promotions.

17. Marquis also limits access to its confidential commercial information to only those who require the information to fulfil their job duties.

## **Marquis's Employment of Savino**

18. On or about April 17, 2023, Marquis hired Savino as a Regional Marketing Director.

19. On or about that same time, in consideration for his employment with Marquis, Savino signed the Agreement, which includes confidentiality, non-competition, and non-solicitation provisions. *See* Exh. A.

20. In Savino's position as Regional Marketing Director, he was aware of and facilitated Marquis' requirement to have other employees execute the Agreement.

21. The Agreement contains a provision prohibiting Savino from competing with Marquis for a limited period of time after his employment terminates. Such provision (Paragraph 5 of the Agreement) states:

> During Employee's employment and for a period of eighteen (18) months after Employee is no longer employed with the Company or its affiliates for any reason, whether such termination is voluntary or involuntary, the Employee will not, directly or indirectly (as a proprietor, employee, principal, agent consultant, partner, shareholder, officer or director or in any other capacity) compete with, engage, participate, have a substantial financial interest in or assist or otherwise be

connected with any person, business or entity engaged in any of the activities or operations carries on by the Company or its affiliates. This restriction will apply within 50 miles from any property operated by the Company or its affiliates, and for which Employee provided services in the last two years of Employee's employment with the Company.

22.   The Agreement also includes a provision prohibiting Savino from soliciting Marquis employees to leave Marquis both during and following the termination of his employment. Such provision (Paragraph 4 of the Agreement) states:

> Employee shall not, either during Employee's employment and for a period of 18 months thereafter, solicit, hire as an employee (or if any other capacity, including, but not limited to, as a consultant), or induce or attempt to induce to leave the Company's employ or to become employed or affiliated with any enterprise other than the Company, any individual who was the Company's employee, including, but not limited to, any director, officer, employee, representative, agent, consultant or independent contractor of the Company, as the case may be, within one year prior to the termination of Employee's employment, either on Employee's own account or for any person, firm, corporation, entity, or other organization.

23.   Pursuant to the Agreement, Savino acknowledged and agreed that if he violated the Agreement, Marquis will be entitled to obtain an injunction restraining any further violation and other equitable relief and attorney's fees. *See* Exh. A, ¶3.

24.   Relying on the promises made by Savino pursuant to the Agreement, Marquis provided Savino access to Marquis' confidential commercial information, including, but not limited to: (1) information regarding business plans, trade secrets, existing or potential transactions with third parties, financial information, intellectual property, products, services, research and development, operations, marketing, sales, pricing, margins and trade know-how; (2) personnel information, such as the identity and number of employees of Marquis and facilities it advises, their compensation packages, skills, qualifications, work completed for Marquis and such facilities, experience and abilities; and (3) non-public information regarding patients of the facilities Marquis advises including contacts, agreements with Marquis and such facilities, and required services.

25. During his employment with Marquis, Savino utilized the training, knowledge and skills he received from Marquis, as well as his access to Marquis' confidential business plans, strategies, and back-office support to cultivate, develop, and maintain relationships with Marquis's referral sources and employees for the purpose of advancing Marquis's business objectives.

26. During his employment with Marquis, Savino was exposed to confidential and proprietary information belonging to Marquis, including, without limitation, Marquis's trade secrets, marketing techniques and strategies, referral source lists and non-public information, relationships and goodwill, and personnel information, all of which is the sole property of Marquis.

27. At all material times, Marquis has taken, and continues to take, reasonable efforts to maintain the confidentiality of its trade secrets and other confidential commercial information.

## Savino's Breaches

28. Atlas is a New Jersey LLC headquartered at 61 Maplewood Avenue, Cranbury, NJ 08512.

29. Atlas operates at least ten skilled nursing facilities within 50 miles of facilities that Marquis advises and to which Savino provided services within the last two years of his employment with Marquis.

30. As a result of his employment with Marquis, Savino was privy to information and strategies that other of Marquis' competitors are not. Savino's addition to Atlas poses a significant threat to the business and goodwill of Marquis and the facilities it advises because he will be able to provide Atlas with Marquis' confidential information that will allow Atlas to unfairly compete with Marquis in the New England region.

31. Savino plans to begin working for Atlas shortly after he leaves Marquis.

32. Upon information and belief, Atlas plans to have Savino work with its New England facilities.

33. Any work Savino performs for Atlas in Massachusetts will violate his non-competition agreement, which restricts him from "compet[ing] with, engag[ing], participat[ing], . . . or assist or otherwise be connected with any person, business or entity engaged in any of the activities or operations carries on by [Marquis] or its affiliates" within 50 miles of any facility for which Savino provided services in the last two years of his employment with Marquis.

34. Upon information and belief, Atlas hired Savino for his knowledge regarding Marquis' confidential and proprietary information, including, without limitation, Marquis' trade secrets, marketing techniques and strategies, patient referral relationships and non-public information, goodwill, and personnel information, all of which is the sole property of Marquis.

35. Upon information and belief, Atlas offered Savino a position shortly before he provided his notice of resignation to Marquis.

36. On or about May 28, 2025, Savino provided Marquis with a four-week notice of resignation. Savino's last day of work with Marquis is scheduled to be June 25, 2025.

37. After receiving Savino's notice of resignation, Marquis began to closely monitor Savino's accessing and downloading of its confidential proprietary information. In or about the week of June 2, 2025, Savino downloaded certain of Marquis' confidential proprietary information onto his personal computer including, but not limited to, documents regarding program overviews, patient care highlights, referral tools, Marquis-specific processes, and other data used in marketing presentations.

38. Savino and Atlas confirmed that Savino intends to begin working for Atlas, one of Marquis' direct competitors in the Massachusetts region, immediately after his termination.

39. Since Savino gave his notice of resignation, multiple employees of Marquis and/or the facilities it advises have been solicited, recruited, and/or induced to join Atlas. Upon information and belief, Savino directly and/or indirectly, solicited, recruited, induced and/or hired these individuals on behalf of Atlas and/or its affiliates.

40. After Savino gave his notice, Marquis reminded Savino of his obligations under the Agreement, including his obligation not to use or disclose Marquis' confidential information, solicit/hire Marquis' employees, or compete with Marquis within 50 miles of any facility he performed work for. Savino responded that he was aware of the Agreement, but he did not give any indication whether he had or would abide by the Agreement.

41. Upon information and belief, after his discussion with Marquis, Savino has continued to directly and indirectly solicit, recruit, induce, and attempt to hire Marquis employees for jobs with Atlas and/or its affiliates and continues to intend to join Atlas as an employee in Massachusetts in violation of the Agreement.

42. As a senior Marquis employee, Savino was acutely aware that the restrictive covenants to which he had agreed in the Agreement with Marquis restricted his conduct after his resignation from Marquis, including restricting him from employment at Atlas in Massachusetts.

43. Furthermore, because of his position, Savino was also aware of Marquis' significant interest in enforcing its restrictive covenants and that Marquis takes enforcement of the restrictive covenants in its employment agreements seriously.

44. Marquis has been harmed, and will continue to be irreparably harmed, by Savino's unlawful conduct.

## CLAIMS

### COUNT I – Breach Of Contract
**(Against Savino)**

45. Marquis restates and incorporates by reference all of the previous allegations as if set forth fully herein.

46. Savino entered into the Agreement with Marquis in exchange for good and valuable consideration, including Savino's employment with Marquis.

47. Marquis has fully performed its obligations under the Agreement.

48. Paragraph 3 of the Agreement states that Savino acknowledges that the restrictions contained in the Agreement "are reasonable and necessary to protect the legitimate business interests of the Company." Exh. A.

49. Savino further acknowledged and agreed that a breach of the Agreement would cause Marquis irreparable injury that could not be compensated by monetary damages and that Marquis has the right "to obtain an injunction restraining any further violation and other equitable relief, without the necessity of showing actual damage." Exh. A at ¶ 3.

50. Savino will breach his non-compete agreement by joining Atlas in a position that requires him to perform services for Atlas facilities within 50 miles of those facilities he provided services to while employed by Marquis.

51. Savino has and will likely continue to breach the employee non-solicitation provisions of the Agreement by directly and indirectly soliciting, recruiting, inducing, hiring or attempting to hire multiple employees of Marquis and/or the facilities it advises.

52. Savino has breached and will likely continue to breach the confidentiality provisions of the Agreement by disclosing, directly or indirectly, the confidential commercial and personnel information of Marquis to Atlas.

53. Marquis has suffered and will continue to suffer significant damages as a consequence of Savino's breaches.

54. Savino's actions have and/or will cause great and irreparable injury to Marquis's business, harming the relationships between Marquis and its referral sources and employees.

55. Atlas hired Savino for his knowledge regarding Marquis' confidential and proprietary information including, without limitation, Marquis' trade secrets, marketing techniques and strategies, patient referral relationships, non-public information, goodwill, and personnel information, all of which are the sole property of Marquis.

56. Savino's breaches entitle Marquis to recover damages suffered and injunctive relief.

57. If Savino is not enjoined from continuing to breach the Agreement by joining Atlas in violation of his non-compete agreement, directly and indirectly soliciting Marquis' employees to join Atlas, and using Marquis' confidential commercial information to Atlas' benefit, Marquis will continue to suffer harm to its business relationships, patient relationships, employee relationships, as well as the significant lost income, time, and expense related to the recruitment and training of replacements for the employees solicited or hired in violation of Savino's Agreement.

### COUNT II – Breach Of Fiduciary Duty of Loyalty
### (Against Savino)

58. Marquis restates and incorporates by reference all of the previous allegations as if set forth fully herein.

59. Savino has a common law duty of loyalty arising as a result of his relationship as an employee, agent, and/or representative of Marquis, including after providing his notice of

resignation.

60. Savino breached that duty by taking and downloading Marquis' confidential and proprietary information onto his personal electronic devices.

61. Savino also breached that duty of loyalty by soliciting Marquis employees, directly or indirectly, to leave Marquis for Atlas, while still employed by Marquis, as well as by providing Atlas with the information necessary to solicit Marquis employees.

62. As a consequence of the foregoing, Marquis has suffered and will continue to suffer irreparable harm and loss, which are ongoing and continue unabated at the time of the filing of this Complaint.

## **REQUESTS FOR RELIEF**

WHEREFORE, Marquis respectfully requests that this Court grant the following relief:

A. Enter judgment in favor of Marquis and against Savino on all counts;

B. Enter temporary, preliminary, and permanent injunctive relief enjoining Savino from improperly competing with Marquis in violation of the Agreement by providing services to Atlas within 50 miles of any facility for which he provided services on behalf of Marquis for a period of eighteen (18) months from the date of entry of the injunction;

C. Enter temporary, preliminary, and permanent injunctive relief enjoining Savino from having any involvement, direct or indirect, in the soliciting, recruiting, approaching, inducing or hiring of any employee of Marquis and/or its affiliates, including any attempt to influence any aspect of a process that could result in the hiring of a Marquis employee by Atlas, for a period of eighteen (18) months from the date of entry of the injunction;

D. Award damages, including punitive and/or exemplary damages, to Marquis in an amount to be determined at trial;

E. Award Marquis costs, reasonable attorneys' fees and interest; and

F. Award Marquis such other relief as this Court deems just and proper.

## **JURY DEMAND**

Marquis demands a jury trial for all claims that may be heard by a jury.

Dated: June 24, 2025                        ATTORNEY FOR PLAINTIFF

*/s/ John F. Tratnyek*
John F. Tratnyek (Bar ID # 027561991)
JACKSON LEWIS P.C.
200 Connell Drive
Berkeley Heights, NJ 07922
Phone: (908) 795-5200
John.Tratnyek@jacksonlewis.com

(*Motions for Pro Hac Vice Forthcoming*)
Erik J. Winton (Massachusetts BBO #600743)
Stephen Paterniti (Massachusetts BBO #564860)
Garrett A.D. Gee (Massachusetts BBO #708219)
JACKSON LEWIS P.C.
75 Park Plaza
Boston, Massachusetts 02116
Phone: (617) 367-0025
Erik.Winton@jacksonlewis.com
Stephen.Paterniti@jacksonlewis.com
Garrett.Gee@jacksonlewis.com

## **VERIFICATION**

I, Sharon Donaghue, under penalty of perjury, verify that I am the Division President for Marquis Health Consulting Services, LLC and that the facts in this Verified Complaint (except those facts based upon information and belief) are true and accurate to the best of my knowledge, or true to the best of my information and belief if compiled by others.

                                                                              Sharon Donaghue

4914-5111-7133, v. 9

# Exhibit A

## AGREEMENT AGAINST UNFAIR COMPETITION

This Agreement Against Unfair Competition ("Agreement") is entered into between Christopher Savino ("Employee") and Marquis Health Consulting Services, LLC (the "Company"), including all of its affiliates, subsidiaries, and divisions for which Employee will work during his employment (the "Company").

The success of the Company and its affiliated entities, and future affiliated entities (individually and collectively, the "Company"), depends on the success and loyalty of their employees (and consultants). The development of information not generally known to competitors and the protection such information has played, and will continue to play, an important role in this success.

In the course of your Employee's employment, Employee has had (and will continue to have) access to this information and other information about the Company. To protect the continued well-being and interests of the Company, its partners and other employees, it is essential that the confidentiality of this information be maintained.

Accordingly, as a condition of Employee's employment or Employee's continued employment, Employee and the Company have agreed as follows:

1. Employee shall not, either during or after Employee's employment with the Company, make any unauthorized disclosure or use of any confidential, proprietary, secret or other non-public information (including but not limited to information that would qualify as a trade secret under the New Jersey Uniform Trade Secrets Act or other applicable State Uniform Trade Secrets Act) about the Company's business, including any business information Employee learned of in Employee's capacity as an employee of the Company. This information includes, but is not limited to, information regarding (i) all commercial, financial, or technical information of a competitively sensitive nature, trade secrets, policies, reports, business plans, business methods, systems, manuals, agreements, performance statistics, operational or administrative plans, confidential personnel information, client and/or customer lists, technology, formulas, designs, software, programs, algorithms, products, systems, applications, processes, procedures, methods and improvements and enhancements, and all related documentation, whether or not patentable, copyrightable or entitled to other forms of protection, utilized by the Company or Company Group or which are directly related to the Business; (ii) the name and/or address of any customer or vendor of any member of the Company or any information concerning the transactions or relations of any customer or vendor of the Company, its affiliates or any of their stockholders, members, principals, directors, officers, employees or agents; (iii) any financial information relating to the Company and its respective businesses, including, without limitation, information relating to pricing or marketing methods, sales margins, cost or source of materials, supplies or goods, capital structure, operating results or borrowing arrangements; (iv) any information which is generally regarded as confidential or proprietary in any line of business engaged in by the Company Group; (v) any business plans, budgets, advertising or marketing plans of any member of the Company; (vi) any information contained in any of the written or oral policies and procedures or manuals of Company; (vii) any information belonging to customers, vendors or affiliates of the Company (viii) all written, graphic and other material (in any medium whether in

writing, on magnetic tape or in electronic or other form) containing any of the foregoing. You acknowledge and understand that information that is not novel or is not copyrighted, trademarked or patented, or eligible for such or any other protection, may nonetheless be Proprietary Information. The term "Proprietary Information" shall not include information generally available to the public and financial statements, projections, budgets and market information (collectively, the "Confidential Information"). Under the federal Defend Trade Secrets Act of 2016, Employee shall not be held criminally or civilly liable under any federal or state trade secret law for the disclosure of a trade secret that: (a) is made (i) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (ii) solely for the purpose of reporting or investigating a suspected violation of law; or (b) is made to Employee's attorney in relation to a lawsuit for retaliation against Employee for reporting a suspected violation of law; or (c) is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

2. If Employee should leave the Company's employ for any reason, Employee shall return to the Company and certify, in writing, within three days of Employee's departure or termination, that Employee no longer possesses any documents (including emails) and copies of documents prepared or received by Employee during Employee's employment that relate to the Company and Employee shall not utilize any proprietary information of the Company in any business endeavor which Employee may undertake following Employee's leaving the Company's employ for any reason. Without limitation on the foregoing, information shall be deemed to be of a proprietary nature if the same was developed by or in conjunction with the Company and the same is not generally available in the public domain.

3. Employee acknowledges that the restrictions contained herein are reasonable and necessary to protect the legitimate business interests of the Company. Since a breach of the provisions of Agreement would injure the Company irreparably and in a way that could not be adequately compensated for by damages, Employee agrees that the Company shall have the right, in addition to its other remedies, to obtain an injunction restraining any further violation and other equitable relief, without the necessity of showing actual damage and without any bond or other security being required. The Company shall be entitled to recover from Employee all attorneys' fees and costs incurred by the Company in connection with any such action.

4. Employee shall not, either during Employee's employment and for a period of 18 months thereafter, solicit, hire as an employee (or in any other capacity, including, but not limited to, as a consultant), or induce or attempt to induce to leave the Company's employ or to become employed or affiliated with any enterprise other than the Company, any individual who was the Company's employee, including, but not limited to, any director, officer, employee, representative, agent, consultant, or independent contractor of the Company, as the case may be, within one year prior to the termination of Employee's employment, either on Employee's own account or for any person, firm, corporation, entity, or other organization.

5. During Employee's employment and for a period of eighteen (18) months after Employee is no longer employed with the Company or its affiliates for any reason, whether such termination is voluntary or involuntary, the Employee will not, directly or indirectly (as a proprietor, employee, principal, agent, consultant, partner, shareholder, office or director or in any other capacity)

compete with, engage, participate, have a substantial financial interest in or assist or otherwise be connected with any person, business or entity engaged in any of the activities or operations carried on by the Company or its affiliates. This restriction will apply within 50 miles from any property operated by the Company or its affiliates, and for which Employee provided services in the last two years of Employee's employment with the Company.

6. In the event of any dispute between Employee and the Company or others, prior to placing or seeking to place or consenting to the placement of any Confidential Information of public record in connection with such dispute, Employee agrees that (i) Employee will afford the Company no less than ten (10) days prior written notice of Employee's intention to place or to consent to the placement of Confidential Information of public record, (ii) Employee will cooperate fully with the Company in any protective orders that the Company may seek so as to prevent Confidential Information from being made available to the public generally (e.g., by appropriate sealing of documents filed with the court) and (iii) any voluntary publication of Confidential Information by Employee shall be limited to placing of public records with the court of applicable jurisdiction only such Confidential Information as is necessary to resolve Employee's dispute with the Company or others and only after the Company shall have been afforded its rights under clauses (i) and (ii) above.

7. THIS AGREEMENT SHALL BE GIVEN EFFECT AND CONSTRUED BY APPLICATION OF THE LAWS OF THE STATE OF NEW JERSEY (WITHOUT REGARD TO THE PRINCIPLES THEREOF GOVERNING CONFLICT OF LAWS), AND ANY ACTION OR PROCEEDING ARISING HEREUNDER SHALL ONLY BE BROUGHT IN THE COURTS OF THE STATE OF NEW JERSEY OR IN A UNITED STATES DISTRICT COURT SITTING IN THE STATE OF NEW JERSEY AND EACH OF THE PARTIES CONSENTS TO THE EXCLUSIVE JURISDICTION OF SUCH COURTS (AND OF THE APPROPRIATE APPELLATE COURTS).

8. Employee agrees that, if Employee violates any of the restrictions contained herein, the Company shall be entitled to damages and an accounting and repayment of all profits, compensation, commissions, remunerations, or benefits that Employee, directly or indirectly, realized and/or may realize as a result of, arising from, or in connection with any such violation; such remedy shall be in addition to, and not in limitation of, any injunctive relief or other rights or remedies to which the Company is, or may be, entitled at law or in equity.

9. Employee further acknowledges that Employee has been notified that Employee may be asked, in the future, to sign additional agreements regarding confidentiality, and addressing other matters which are the subject of this Agreement, as a condition of Employee's continued employment.

10. Employee acknowledges and agrees that the services and/or work Employee provides is "work for hire" services within the definition of Sections 101 and 201(b) of the United States Copyright Act, 17 U.S.C. §§101 and 201(b), and as such the Company is deemed to be the author of the work and owns all rights, title and interest in and to the work under any and all laws of any nation or territory and under any and all conventions or treaties including, but not limited to, the Berne Convention and the Universal Copyright Convention. Employee waives and releases any and all rights, title and/or interest in and to the work, now and/or in the future, including, but not limited to, any and all copyrights, patents, trademarks, service marks, proprietary rights or intellectual property.

      Employee agrees that if the services and/or work may not be considered work for hire under 17 U.S.C. §§101 and 201(b), Employee assigns any and all rights, title and/or interest in and to the Work, including, but not limited to, any and all moral rights or related non-economic rights whatsoever, and shall, without further consideration but at the expense of the Company, execute any additional documents that may be necessary to effect this transfer. In the event the Company is unable for any reason whatsoever to secure Employee's signature to any lawful and necessary documents required, including those necessary for the assignment of, application for, or prosecution, including, but not limited to, renewal, of any applications and/or registrations for copyright, patent, trademark, service mark and/or other protection of intellectual property or proprietary rights in the United States or in any other country, territory or jurisdiction, Employee hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as agent and attorney in fact, to act for and in Employee's behalf and stead to execute and file any such application and to do all other lawfully permitted acts to further the assignment, prosecution and issuance of copyright, patent, trademark or service mark thereof with the same legal force and effect as if executed by Employee. Employee hereby waives and quitclaims to the Company any and all claims of any nature whatsoever which Employee may now have or hereafter have for infringement of any copyright, patent, trademark, service mark, proprietary right or intellectual property resulting from any such application or use thereof;

11. This Agreement sets forth the entire understanding of the parties hereto with respect to the matters addressed herein. Any modification of any nature of this Agreement shall be effective and binding only if it is in writing and signed by the Company and Employee. No oral understanding can in any way, alter or modify or amend this agreement. This Agreement shall survive the cessation of Employee's employment for any reason.

12. In the event any provision, clause or application of the Agreement is invalidated or found unreasonable by a court of competent jurisdiction for any reason whatsoever, it is the intention of the parties that such invalidated, unreasonable, or unenforceable provision, clause or application may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state. If a court declines to amend this Agreement as so provided herein, the invalidity or unenforceability of any provision, clause or application of this Agreement shall not affect the validity or enforceability of the remaining provisions, clauses or application, which shall be enforced as if the offending provision had not been included in this Agreement.

13. Unless Employee and the Company have executed and delivered a separate employment agreement with the Company for a term of employment for a fixed number of years, Employee understands that (a) Employee's employment may be terminated by the Company at any time with or without cause; (b) this Agreement shall not be considered in any manner to affect any aspect of Employee's employment except with respect to the matters as provided herein, and shall not be construed as a contract of employment for a definite term; and (c) Employee understands that Employee is an employee at-will.

14. Failure on the Company's part to exercise any rights or privileges granted to it by this Agreement or to insist upon the full performance of all obligations or duties assumed by Employee shall not be construed as waiving any such rights, privileges, obligations or duties, or as creating any custom

contrary thereto. Employee agrees that if Employee acts in violation of this Sections 5 or 6 of this Agreement, the number of days that Employee is in such violation will be added to the eighteen (18) month period specified in such Sections.

15. Employee understands this Agreement has legal significance. Employee expressly states that Employee has read this Agreement carefully, understands it and has discussed it with any advisors Employee may have.

16. This Agreement shall be binding upon Employee and Employee's heirs, executors, and administrators, and upon the Company and its successors, assigns, subsidiaries, and affiliates, whether in existence now or hereafter created, and this Agreement shall inure to the benefit of the Company, its successors, assigns, subsidiaries, and affiliates. This Agreement may not be assigned by Employee. This Agreement applies to Employee's current position and will continue to apply notwithstanding any changes made in the future to such employment, including but not limited to changes in Employee's department, position, salary, benefits, bonus plans, job title, reporting structure and job responsibilities. The restrictions described in this Agreement apply even if previously Employee's position was not restricted.

IN WITNESS WHEREOF, the parties hereto have knowingly and voluntarily caused this Agreement to be executed as of the date set forth below.

[Marquis Health Consulting Services, LLC]     Christopher Savino

_____               _____

4842-8014-8876, v. 1